We will hear argument next in case 2315 Sanchez v. Mayorkas. Ms. Zaharia? Mr. Chief Justice, and may it please the Court, TPS recipients satisfy the admission requirement for adjustment to lawful permanent resident status. That is because Section 1254A.F.4 considers TPS recipients to be in lawful status as a non-immigrant for purposes of adjusting status and having been admitted is inherent in non-immigrant status. The government's view that admission is not inherent in non-immigrant status is untenable. The INA distinguishes between categories of persons who are admitted and those who are not. Some persons with lawful status such as asylees and parolees are not admitted. Individuals in non-immigrant status are admitted. As the DHS policy manual states, a non-immigrant is a person who is admitted for a specific period of time. The INA's express exception for non-immigrant crewmen demonstrates that unless Congress makes an exception, admission is inherent in non-immigrant status. The government's primary response is to argue that the statute considers TPS recipients to be in lawful status but not admitted. But if Congress intended only that limited function, it need only have said that TPS recipients are considered to be in lawful status, period. The function served by the additional phrase as a non-immigrant is to ensure that TPS recipients are considered admitted just as all non-immigrants are. This is the only sensible reading of the statute. TPS recipients are subject to rigorous scrutiny and risk removal by coming forward and registering. In exchange, Congress made them eligible to adjust status if they acquire a qualifying relationship, assuming they meet all the statutory requirements, which not all will. By contrast, the government's interpretation would shrink the pool of eligible TPS recipients to the few with non-immigrant status before they receive TPS. There is no warrant in the text for that result. I welcome the court's questions. Counsel, as I understand your argument, it's that people in non-immigrant status go through a process to get there that includes admission and inspection. And there's another way to get to non-immigrant status, and that is by being a TPS recipient. And your argument seems to me to be that, well, if you're in non-immigrant status as a TPS recipient, you must have been admitted and inspected or treated as such because that's the other way to get to non-immigrant status. And I wonder why they're just not two different routes. And if you come in one route, the TPS route, that doesn't mean that you've checked every box to get in through the other route. So it seems to me that I can't follow the logic of your main submission. So I don't think that is an entirely accurate characterization of our position. Our position is not that TPS recipients are in non-immigrant status. It's clear that they are not for all purposes. Our position is simply that S4 considers TPS recipients to be in lawful non-immigrant status for just one purpose, that purpose being adjustment of status. And importantly, the only characteristic of non-immigrant status that is even relevant to adjusting status is the fact that non-immigrants are inspected and admitted. Well, but usually, I mean, there are other places where Congress deems people, when they want to get to that same status, to have been admitted and inspected. And therefore, you would say, well, they should be regarded as having checked that box when you're determining parole and other situations. But that's not what the statute does here. It doesn't say that you are deemed to have been admitted and inspected. It says that you have non-immigrant status. That's because that particular formulation would not have achieved all of Congress's objectives in S4. For example, deeming TPS recipients simply to have been inspected and admitted would not have permitted TPS recipients to change to non-immigrant status under Section 1258. And we know Congress intended that as well because it cross-referenced Section 1258. The beauty of what Congress did was to choose broad language that achieves multiple different objectives in S4, and that's why that narrow formulation is not what Congress chose. Thank you, Counsel. Justice Thomas? Counsel, what's on your argument is that the status, the non-immigrant status necessarily entails inspection. Do you have a case for that? Yes, Your Honor. The case that states that is a decision by the board in a case called Garnica-Silva. I will confess it is unpublished, but it's exactly on point. In that case, a non-immigrant who received their status from inside the country as a U-Visa non-immigrant argued that he was not admitted, and the government and the board both agreed that, of course, he was admitted because all non-immigrants are admitted. Could you elaborate on what it means to be admitted in that case? Yes. The question in that particular case was whether that particular person was deportable as someone who had committed a crime within a certain period of admission. His position was because he had not received his non-immigrant status at the border, he was not deemed to have been admitted as that term is defined in the INA, but the government and the board disagreed with that position. As they explained, the INA consistently treats all non-immigrants except for alien crewmen who are accepted as having been admitted. That is the defining characteristic of non-immigrant status is the fact that they were admitted into that status. In that case, the board held that unlike asylees, for instance, who are not admitted, non-immigrants are admitted. In the case of petitioners, how does that work? Because they clearly were not admitted at the borders. Is that a fiction? Is it metaphysical? What is it? I don't know. Where do we get it? Just from the definition, we assume that if you gain a certain status, you assume that for the purposes of gaining that status, you must have been admitted. But we know for a fact that's not the case. What do we do with that? Well, F4 uses considering language, which is the language that Congress typically uses when it wants to create a legal fiction. The legal fiction that Congress created here is that TPS recipients are deemed to be in lawful non-immigrant status for the purpose of adjusting status. Again, the characteristic of non-immigrant status that is relevant to adjusting status is the status at all under Section 1255A, even though the word non-immigrant does not appear in that provision. It's because the words inspected and admitted are describing non-immigrants. Thank you. Justice Breyer? Well, I have to admit that the immigration statute is pretty complicated. So is there a simple way of explaining this? I mean, I look at 1255 and it says if you want to be a permanent resident or something like that, you have to have been inspected and admitted, which your clients weren't. And then we look over here at the temporary protected and it says during a period where you're granted temporary status, you do have lawful status as a non-immigrant. Well, it's during that period. It doesn't say anything about that you could apply. But you say, well, the word non-immigrant automatically means admitted. So we look through some of this and, for example, the U visa holder, the statute says they can apply if they were admitted or otherwise provided non-immigrant status. Now that seems to say admitted is one thing. Non-immigrant status may sometimes include that, may sometimes not. I mean, so it helped me. Sure. So with respect to a few responses with respect to the U visa holders, number one, they didn't exist in 1990 when Congress passed the statute. So even if it were true that there is some category of non-immigrants who are not admitted, that came about later. That cannot have informed what Congress was thinking in 1990. But more fundamentally, I would again point the court to the decision that I cited before, which is the matter of Garnica-Silva case. Because in that case, the immigrant cited the very language that your honor just pointed to. And the government said, no need to worry about that language. That language simply explains that someone may already be admitted as a non-immigrant in a different classification and then change into the U visa status classification under section 12. I see that. But look, to me at the moment, it seems to make sense to say either. I mean, you could say you're here, Mr. Smith. Mr. Smith, you came in absolutely illegally, absolutely wrong that you're here, but you're here. And if you're here, we're not going to ship you back to a place where you're really in danger. OK? Well, you're in danger. But once that's over, goodbye. That's a way of looking at it. Or it could have meant, well, we want to keep you here. Once you're here and you're in a terrible situation, you might have been here for a long time. Some who were here for a long time, the attorney general could say, OK, we waive all that, I guess. But it could mean either. So what do we do? I mean, how strong is this argument? It must automatically mean. Well, it's very strong because there's no other logical interpretation of what Congress was doing. And logical interpretation is what I said. They said, Mr. illegal alien, illegal person, you came in illegally. OK, we won't ship you back yet because there's a big war or something in your country. But when that's over, you're over here. Why isn't that logical? Well, because Section F-4 exists in the statute and it has to have a purpose. And the government's interpretation gives no purpose to the words as a non-immigrant in F-4. Those words are critical because Congress would have understood clearly from the INA in 1990 that I'm back at my original question. You say, well, it must mean admitted. Well, it didn't in the U-Visa case because they had both things separately. So there must be some way of becoming a non-immigrant here lawfully where you were not automatically admitted lawfully. And here it is right in our statute in front of us and also in the U-Visa case. Anything else? I mean, is that why is that so far off base? Explain that to me. I'd like to know. So again, the U-Visa category did not exist. So what? Justice Alito? Well, here's another example along the same lines. Section 1255 M refers to, quote, an alien admitted into the United States per ren or otherwise provided non-immigrant status. Why doesn't that mean that Congress contemplated that one could be in a non-immigrant status without having been admitted to the United States? Well, Justice Alito, that is the very same language that I was just discussing with Justice Breyer. Section M applies to U-Visa holders. And this section, number one, did not exist in 1990. But number two, as the government explained to the board in the Garnica-Silva case, that language simply refers to the possibility that someone could obtain U-Visa status by changing to that status after already having been admitted into a different status. And it was important for Congress to use those words here because this provision sets forth special procedures for U-Visa immigrants to adjust status. And so Congress needed to make clear that whether they receive that by being admitted into that status or whether they receive that status by changing into that status, they would be eligible for these special procedures. Would you agree that if Congress did in F-4 what you say it did, it went about it in a very roundabout way? It specifically addressed two of the requirements for eligibility for adjustment of status, namely being in and maintaining lawful status as a non-immigrant, but it didn't say anything about inspection or admission. Why would it do that? Why would it leave it to the courts to infer that lawful status as a non-immigrant necessarily means inspection and admission? Well, because Congress used broad language that both accomplish its objectives with respect to 1255A, but also accomplish its objectives with respect to 1258 and 1255C-2. And I think it's critical that under the government's interpretation that F-4 simply was intended to overcome C-2, that interpretation renders the words as a non-immigrant superfluous. And that is because under Section C-2 multiple forms of lawful status can satisfy that provision. Some of those forms of lawful status, such as asylum, do not require admission, but Congress chose a form of lawful status, non-immigrant status, in which admission is inherent. In the same way, for example, that having been paroled is inherent in parolee status, having been inspected and admitted is inherent in non-immigrant status. In a footnote in your brief, you assert that your clients were paroled into the United States. Does that satisfy 1255A? It does satisfy 1255A, but it does not satisfy Section 1255K, which petitioners need to satisfy as employment-based applicants. Thank you. Justice Sotomayor? Counsel, I'm sorry, I'm lost. Aren't asylum, people who receive asylum, they're not admitted, but they're in non-immigrant status, aren't they? No, they're in asylee status. They are not in non-immigrant status. But crewmen are in non-immigrant status. That is correct. And that's why for crewmen, Congress had to create a special statutory exception, because the default rule in the INA is that persons with non-immigrant status are admitted. One of your other arguments is that Section 1254AF4 provides that TPS recipients should be considered as both being in and maintaining lawful status as a non-immigrant. And you're right that usually we hesitate to interpret a statute in the way that would make any of its arguments operative or irrelevant. In the case of being in, however, the government responds that being in parallels Section 1255C2 bar on an applicant who is in unlawful immigration status, while the maintaining parallels the separate bar on an applicant who has failed to maintain continuously a lawful status. Your reply brief did not comment on the government's argument. Because it is a way to understand that there's not a superfluous argument. So would you comment now and explain why the government's wrong? Sure. Two reasons. Number one, the government's argument that the language of Section F4 simply tracks the being and maintaining language in C2 overlooks the words as a language in particular. The government's position is that the only people who benefited from this provision when it was enacted are people who are already in lawful non-immigrant status. And for those people, the word maintain does all the work. It satisfies both the being and maintaining language in C2. And that is why when Congress wrote other contemporaneous provisions, including in the rejected Senate version of this very act, and it expressly limited the adjustment of status benefit to persons who are already in lawful non-immigrant status, as the government claims this provision does, Congress used only the word maintaining. The government has given no effect to Congress's obvious choice to use broader language in F4 and to omit any restrictive language, restricting the benefit of F4 to persons already in lawful non-immigrant status. Thank you, counsel. Justice Kagan. Mr. Harry, you say in your brief, and I think this is critical to your argument, all persons with lawful non-immigrant status are by definition inspected and admitted. If that's not true, can you still win this case? No, I don't. I don't believe so. Okay, so what makes that true? I mean, you say by definition. I mean, I want to look to some statutory language that tells me that that's true. Where am I supposed to look? Well, I think you would look to Section 1184 of the INA, which is the section that authorizes the government to confer non-immigrant status on individuals. And that statute refers to that process as admission. Well, I mean, there's nothing in that section, is there, that says, that reads, that, you know, that stands for the broad proposition that you're stating? I mean, the section says the admission to the United States of any alien is a non-immigrant, but why does that suggest that admission is something that all non-immigrants get? Because there's no other mechanism in the INA for the government to confer non-immigrant status on individuals. It is the only mechanism with the exception of the one category that is accepted, which are alien crewmen. That's why the INA over and over and over again describes non-immigrants as admitted. But I mean, you yourself said 1255M suggests something different, and you said, well, we shouldn't look to that because it was passed afterward. But just the fact that 1255M could have been written without saying something like, you know, notwithstanding Section 1184 suggests that there's no rule of the kind that you're talking about in the first instance. I would point the court again to the board's discussion of that very language and 11, excuse me, in Subsection M, where the board reviewed the INA and the regulations governing U visa recipients and other non-immigrants. And the board said, considering all of that, the statutory text and the regulatory text, that non-immigrants are admitted. And that language only was referring to the fact that someone could change into that status after already being admitted in another kind of status. Thank you. Justice Gorsuch. Thank you, Chief. I have no questions at this time. Justice Kavanaugh. Thank you, Chief Justice. Ms. Zaharia, good morning. Good afternoon. Good afternoon. And I think the questions my colleagues have pointed out and Judge Hardiman's opinion in the Third Circuit point out that you more broadly, I guess that raises the question for me of we need to be careful about tinkering with the immigration statutes as written, particularly when Congress has such a primary role here. Congress, as I understand it, passed a recent bill. The House, I should say, passed a recent bill on this issue. It obviously has not passed the Senate yet. But just kind of big picture, why should we jump in here when Congress is very focused on immigration and when you're relying, putting forth a good argument, but relying on chains of inferences rather than specific languages, I see it at least? Well, because respectfully, we are relying on the specific language of F4. And that specific language is that TPS recipients are considered to be in lawful status as a non-immigrant. Again, the government cannot give any effect to those critical words and the statute. If Congress intended only to do what the government claims it was doing, it need only have said that TPS recipients are being in and maintaining lawful status, period. Don't you think the flip side also applies of Congress was intending to do what you want? It seems almost certain there would be more explicit language. I don't think that's the case because Congress used broad language that both satisfies Section 1255A but also satisfies Section 1258. And what is the status in Congress? Are you aware? I'm not aware, Your Honor, of what is the status in the Senate. But it's not surprising that Congress would seek to clarify this issue given the existence of a circuit split on this question. Thank you very much. Justice Barrett? Good morning. So I have a question about 1254AH. So it seems to me that that provision cuts supermajority support to approve any legislation that provides for adjustment to lawful temporary or permanent resident alien status for any alien receiving TPS. So if Congress tied or the Senate, you know, in the bill that Congress passed has tied its own hands in that way, it would seem unusual that in the same breath by using non-immigrant status, Congress intended to those in TPS status as eligible for LPR status based only on the word non-immigrant. Could you address that? Sure. So both parties agree that F4 allows some TPS recipients to make use of the existing mechanism for adjusting status and subsection H just doesn't say anything about which one. Subsection H only tells us that Congress wanted to make it more difficult for a subsequent Congress to establish a new standalone mechanism for TPS recipients to adjust status. And that makes sense because Congress had done that in the past where it would take broad categories of people and make them automatically eligible to adjust status. And so Congress, yes, did tie its hands with respect to creating a new mechanism, but section F4 doesn't create a new mechanism. It just gives otherwise eligible TPS recipients access to the existing mechanism in section 1255. The government's interpretation does give F4 work to do because, you know, those who were in lawful status before, for example, if they overstayed student visas, but then became eligible for TPS status, you know, that overstaying is forgiven if there was a gap, or similarly, if they got TPS status while in lawful non-immigrant status holding a student visa, you know, F4 still helps and cures those obstacles to becoming an LPR. Could you address that? Yes, F4 is an odd way to accomplish that very narrow purpose, given that it applies on its face to all TPS recipients, and given that Congress knew that the first TPS recipients included hundreds of thousands of individuals who had entered the country unlawfully. It's also an odd way to write that provision, given that the Senate version of the act contained that very provision that the government claims this does, but on its face that provision was limited to people who were already in lawful non-immigrant status. Thank you. A minute to wrap up. Ms. Zaharia? Yes. Having been admitted is inherent in non-immigrant status in the same way that having been paroled is inherent in parolee status. If Congress had stated in F4 that TPS recipients should be considered as being in and maintaining parolee status for purposes of adjusting status, no one would question that Congress intended for TPS recipients to be considered to have been The same is true here. Having been admitted is inherent in having non-immigrant status, and it is the only characteristic of non-immigrant status that is relevant to adjusting status. Congress's choice to consider TPS recipients as being in non-immigrant status as opposed to some other form of status means that they are considered to be inspected and admitted for purposes of adjusting status. Thank you. Thank you, Counsel. Mr. Houston? Mr. Chief Justice, and may it please the Court, an agency does not act contrary to law when it interprets a statutory term in accordance with its statutory definition. For petitioners to be eligible to adjust to lawful permanent resident status, they need to show, among several other things, that they were admitted into the United States. But admitted is a defined term in the INA, and petitioners concede that they do not meet that definition. They did not make a lawful entry into the United States after inspection and authorization by an immigration officer. Petitioners instead contend that Congress implicitly deemed TPS recipients to be admitted by giving them lawful status as non-immigrants. But the TPS statute's two-part lawful status benefit directly tracks the two-part lawful status requirement for adjustment of status. The TPS statute does not address the multiple other requirements for adjustment of status, such as admission. And that's confirmed by the fact that the lawful status benefit is available only, quote, during the TPS period, which strongly suggests that it does not retroactively cure pre-TPS conduct that made the person ineligible for adjustment. Petitioners' argument by syllogism collapses because nothing in the INA defines non-immigrant status to necessarily include admission. And more fundamentally, petitioners' argument relies on implications and an unstated cross-reference, but Congress does not make unambiguous exceptions to statutory definitions in such circuitous ways. And that is particularly true in this statute, where Congress did create several express exceptions to the various requirements for adjustment of status, but did not provide any comparable exception for TPS recipients. TPS offers temporary protection against removal during a crisis, and it preserves the existing opportunities of previously admitted non-immigrants to adjust their status. But USCIS reasonably determined that Congress did not establish TPS as a special pathway to permanent residence for non-citizens who were already barred from that privilege because of pre-TPS conduct. Mr. Houston, I was struck by the extent to which your brief undersold your position. Throughout it, you said things like the text doesn't foreclose your position, the court was not required to accept the petitioner's reading, the statute does not clearly exclude your reading, Congress did not unambiguously mandate the opponent's position, and of course you ended by saying that it would not be entirely unreasonable for the court to rule in your favor. I made that last one up, but that's what I was expecting to see. Do you want us to say that your interpretation of the statute is the correct one? Your Honor, we think that the court should follow its precedence in the immigration area, particularly Martinez-Gutierrez, which has indicated that when an agency, as in this case, has consistently interpreted the statute with the force of law, the agency's position prevails if it's a reasonable construction of the statute, and the court has no need to decide whether there's any other construction that would be possible. I think that's what the court's precedence dictate as the analytical approach to these types of cases, and we just think the court should follow that here. Well, did you think that at the cert stage? Because in your response to the petition for cert, and this is a quote, the court of appeals reading clearly represents the best one in light of the statutory text, structure, and context. Is that still the department's position that your reading is clearly the best one? Your Honor, we absolutely contend that the government's position is the better reading of the statutory text, and even if the court was not inclined to apply Chevron deference, the result would be the same. We think our interpretation is the better one. All we're saying is that we don't need, in this case, to show that there is no other interpretation, and as I think petitioners have acknowledged in their brief, in order for them to prevail, they need to show that this statute unambiguously forecloses the government's position, and our respectful submission is that they can't clear that high bar. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, as a matter of curiosity, if the petitioners here were allowed to leave the country for a brief visit abroad in return, would they then be eligible for adjustment of status? Not under the government's current interpretation of the statute, Justice Thomas, although the government announced that interpretation in a case, in a decision called INRI CRCC in 2020, and it did not make that decision retroactive to people who had traveled before 2020. So the argument that petitioners make that the inspection is implicit in the status as a non-immigrant, it seems to be quite reasonable. I mean, how else would you categorize someone as a non-immigrant under these statutes other than assuming that they have been inspected or that they have been deemed to be inspected? Justice Thomas, the non-immigrant statuses are defined in the INA at 8 U.S.C. 1101-A-15, but nothing in that provision states that it is a condition of receiving one of those non-immigrant statuses that you were necessarily admitted. As I think petitioners have recognized throughout this case, admission and lawful immigration status are distinct concepts. Your immigration status refers to your permission to be present in this country. And as I think the example of alien crewmen demonstrates, there's nothing in the INA that bars Congress from saying to a particular group of people, you will have the status of non-immigrants, and that's exactly what Congress says to persons who come here as crewmen on foreign vessels while they are here. They make a lawful entry, so they would seem to fit the definition of admitted, but Congress says you are lawful non-immigrants, but you are not admitted. There's nothing in the INA that forecloses that because admission is not a constituent part of what it means to have non-immigrant status. Well, why couldn't the designation for the crewman be considered an exception to the general rule? The reason why that exception for crewmen is in there, Justice Thomas, is again, because alien crewmen, they do make a lawful entry. They of course come here lawfully on their vessel and when that vessel lands, so they would seem to fit the ordinary definition of admitted. So I think it makes sense that Congress would clarify you are not admitted while you are here for the purposes of staying until your vessel departs. I think that's just a perfectly sensible thing to do, but the broader point is that when you look at the various non-immigrant statuses that are described in Section 1101A15, you will not see anything that says the person in order to have this status must necessarily have been admitted. We simply use the admission process to bring in people who come here lawfully from overseas, but that's not part of what it means to have non-immigrant status. Thank you. Justice Breyer? Well, my following, I'm from Justice Thomas. I take the argument of the petitioner simply this. You look through the United States, look everywhere, everywhere, every tunnel, every mountain, every lake, every human being you come across who is not, etc. If they are non-immigrants and they are here lawfully, they are here as non-immigrants. They will have been either deemed to be or actually been lawfully admitted. So it goes along with the game. There we are. But I admit there are two exceptions. One's crewman, where they use both terms, and that could just be over-insurance because they wanted those people admitted. And the other is the U visa. And the U visa, they could have been trying to do uncertainty. Okay. So doesn't that lead, are there other examples that I've missed? That's my main question. Other examples that I've missed. And if there are no others, then aren't we in the world where there is ambiguity in the statute and we have to get into the Chevron issue, which as you well know, is a big issue where there are two sides. And should this be the case where we get into that? All right. Both questions. Justice Breyer, I don't think there are any other classes of non-immigrants who are not admitted. But importantly, one of the key reasons for that is that there are certain kinds of non-immigrants who receive that status within the United States after an unlawful entry. And those people, of course, would not meet the statutory definition of admitted in the ordinary case. But in some cases, Congress has nevertheless labeled those classes of non-immigrants as admitted. And of course, Congress is free by context to change the meaning of admitted. And it's done that a couple of times. And as you know, I think the U visa example shows this too. Congress has specified that U non-immigrants are eligible to adjust their status, whether they were admitted or otherwise acquired that status. So we think that it is not necessary for the court to reach to get into Chevron deference here because we simply think we have the better interpretation of the statutory text. If the court was inclined, if the court thought that the statute is ambiguous, I think that the combination of various sources where the government has consistently interpreted this statute the same way that we do since 1991, in a decision by the Board of Immigration Appeals, in a decision that in a response to notice and comment rulemaking, all would make the case for deference very easy. Justice Alito, would it be reasonable to interpret the statute the other way? Well, the agency hasn't taken a position on that, Your Honor. And I wouldn't want to foreclose the agency from considering whether there's an alternative position. The last time that the agency looked at this question in HGG, it said, we think the statute is unambiguous at Chevron step one, but it observed that some courts of appeals had disagreed with it. And so it said, if we're wrong and the statute is ambiguous, we would reach the same interpretation for all of the same reasons. I think that this court's precedents say that in a case like that, the court will simply look at whether the agency's interpretation is reasonable. And if so, it need not decide whether any other interpretation is possible. And if I might just make, say one more thing about why I think that sort of judicially modest course is particularly appropriate here, it's because the court has recognized that in immigration law in particular, Congress has expressly delegated interpretive authority to the Attorney General and the administration of the INA, and particularly something like this, setting the terms of humanitarian protection for foreign nationals, implicates foreign relation questions that belong best to the executive. Well, members of the court may have different opinions about Chevron. So are you saying that it is necessary for us to address Chevron here? No, your honor, the court can simply find that the government has the better interpretation of the statutory text and say no more. And we certainly think that that is the case for all of the reasons that we have the better interpretation. Won't that foreclose you from later changing your position? No, your honor, not under the court's decision in brand X, the court, the agency could theoretically decide that although it's taken a position, it has had this position since 1991. It studied the question further and concluded that the statute was ambiguous and that it should resolve that ambiguity by taking a different interpretation. It's possible the agency could decide to take that course in a future case, but I think it's not a question the court has reason to address now because the agency has an interpretation and it's reasonable. But even if, even if you didn't want to get in the Chevron framework, our interpretation is the better one. Well, I really don't understand your answer. When you refer to brand X, are you not backing to Chevron? I think the court's decision in brand X recognizes that it is possible theoretically that there can be more than one reasonable construction of a statute. I think what we're saying is if you wanted to avoid getting into the Chevron framework altogether, you could do so by simply saying that our interpretation is better than the one that petitioners have reached. But the more standard procedure, I think in a case like this, the court's precedents show, would be to ask whether the agency's longstanding and consistent interpretation is reasonable, and if so, it prevails. Thank you. Justice Sotomayor. Counsel, I'd like to return to Justice Thomas's question about people who have traveled abroad, been given permission, TPS people who have been given permission to travel abroad. The miscellaneous and technical immigration and naturalization amendments of 1991 provide that in the case of an alien who's given TPS, whom the Attorney General authorizes to travel abroad temporarily, and who returns to the U.S. in accordance with such authority, the alien shall be inspected and admitted in the same immigration status that the alien had at the time of departure. Says it right there, shall be inspected and admitted. By the plain text, it seems to me that any TPS holder who is granted permission to travel abroad and return would be admitted within the meaning of Section 1255. Yet, you're telling me that the agency has said no in 2020. It makes no sense to me, counsel. You yourself argue that there's a difference between lawful non-immigrant status and admission and if that's the case, how can you win on that argument? Justice Sotomayor, the first thing to note about this argument, of course, is that petitioners have expressly waived it in this case. And as my friend explained, that's because the government's consistent practice before 2020 has been to treat the return from authorized travel for TPS I'm happy to answer the question. Well, but whether it was treated as a parole or not, we got to go by the words of the statute. And the words of the statute talk about it being an admission. So you want to recharacterize it as a parole or I don't know why they forfeited at all, but other people may not. It just seems to me that if you're asking us to find the better reading of a statute, we should go by its terms. Those people have been admitted. Justice Sotomayor, we think that the clear import of MTNA, this statute, is to make the point that when a person who has TPS is authorized to travel abroad and comes back, they come back in return in the same immigration status that they had when they went out. And I think that is certainly the reasonable reading of that text. And then we get into Chevron. But if we're going to go as we have suggested, which is go to the better reading of the actual language of the statute, you lose. No, respectfully, Justice Sotomayor, I mean, I disagree with that. I think the other thing to note about this argument, of course, is that it's outside the scope of the question presented, because it only applies to people who travel abroad. And the question presented in this case is about the effect of granting TPS itself. But again, I think the clear import of MTNA is to specify that a person goes out and comes back in the same status. And what that's going to mean for a person like petitioners is that they will return to the United States in the status of someone who has no lawful immigration status, who is present here unlawfully and is subject to removal, but because of TPS, will not be removed temporarily during conditions in their home country. That's their immigration status. I've run out of time. Justice Kagan. Mr. Houston, you said earlier that nothing defines non-immigration status to include admission. And when I said something similar to Ms. Saharia, she told me that 1184A does just that. So could you tell me how you read that provision? Certainly, Justice Kagan. I think the purpose of 1184 is to specify the conditions that the government may use to admit non-immigrants. Of course, it's true that there are many, many non-immigrants who come to this country abroad and enter lawfully through a port of entry. They get admitted. And it makes sense that Congress in Section 1184 wrote a provision granting the service authority to set some of the restrictions and requirements for that admission process and then imposing some of Congress's own. It does seem, though, Mr. Houston, that these phrases like admission is a non-immigrant, they arise repeatedly in the immigration statutes so that Congress seems to be assuming that non-immigrants are in fact admitted and that the status admission distinction that you continually press on us is really not a distinction with respect to non-immigrants. Your Honor, I think it is certainly true that the overwhelming majority of people who have non-immigrant status get it by coming here lawfully. And the fact that there are references throughout the INA and in the regulations and in the policy manual and things like that to people admitted as non-immigrants just reflects that reality. Most people come here lawfully, and that's how they get non-immigrant status. But it remains true that both as a matter of statutory text, and keep in mind, there's a definition of a non-immigrant status, in this statute. And so I think as a matter of text, as a matter of ordinary usage, admission is a factual event. It's something that happens at a particular place and time. Lawful status refers to permission that the person has. And so there's just nothing... Let me switch gears a little bit. On your view, under what conditions can a TPS holder actually become a lawful permanent resident? Oh, Your Honor, there are tens of thousands of TPS holders who have successfully adjusted their status to lawful permanent residence. People do this every year. The only thing they really... And what are the conditions in which they can do it? Sure. They just need to have come here originally and been admitted. They need to have been admitted as a student or an au pair or a temporary worker or something like that. Anyone who comes here lawfully in one of the non-immigrant statuses, except crewmen, would be able to demonstrate that they are here, they have been admitted. And then even the TPS will allow them to stay here longer than their status would normally have done. And the purpose of Section F-4 is to say, even if you were originally out of status, while you are being allowed to remain here, we will preserve your existing opportunity to adjust your status. It is a good question. Justice Kavanaugh? Thank you, Chief Justice. Good afternoon, Mr. Houston. Just in terms of your position here with respect to how, if you were to prevail, the opinions phrased, I think there are three options, and I just want to explore them with you. One, you argue that we could just say it's at least reasonable, your interpretation is at least reasonable. The second option is to say that your interpretation is the better one, not the unambiguously better one necessarily, but just the better one. And the third option is to say that your statutory interpretation is unambiguously the correct one. I gather you don't want us to say the third. Justice Kavanaugh, we would urge the Court to follow the first of those proposals because I mean, just, you know, in courts of appeals, certainly all three of those options are deployed routinely, and at this Court as well. Sure, Your Honor, I understand that. I mean, I think, I'm not sure I see a meaningful difference between the first and second interpretation. The first one, you wouldn't be saying it's the better interpretation, you're just saying it's at least a reasonable interpretation of the statutory language. I think that would be our preference, Your Honor, because we think it follows most directly from this Court's immigration preference, and because, you know, we think that the agency is the one who is charged with the administration of this statute. And if the agency, you know, we think the Court generally does not foreclose the agency from thinking about the problem in the future. And so I think it's notable that under this Court's precedence, petitioners have a high bar to clear. We think they haven't cleared it, and we think it's sufficient for the day for the Court to say that. Okay. How many people are in the country who are in this same status, roughly? Do you mean temporary protected status, Your Honor? Yes. We understand that there are approximately 400,000, although the government's understanding is that about, approximately 85,000 of them have already successfully adjusted to lawful permanent residence status. And one of the amicus briefs of the American Immigration Lawyers Association and others says that roughly 80% of those have been living in the United States for more than 20 years, and have married and had children, authorized to work here. Do you dispute that? No, Your Honor, we don't dispute that. But I think it is the defining characteristic of temporary protected status. Is that it's not temporary? Well, it has turned out, I think, to last. Some of these crises have turned out to last for a while, and the United States, I think, has been extraordinarily generous. And it is a testament to the strength of our humanitarian commitments, that we have allowed people who have been here for a very long time, but all TPS recipients receive that status with the unambiguous awareness that it is a temporary form of relief from removal that will not last forever, because the government has to continuously re-evaluate whether the conditions in the home country persist. And moreover, the recipient himself has to re-register for the status on an ongoing basis. So everyone understands that. I understand that. It puts the people in a very awkward position year after year, and I'm sure you understand that. But I'll let that go. Thank you. Justice Barrett. Good morning, Mr. Houston, or I guess it's afternoon now. I want to follow on to the questions that Justice Kavanaugh was asking you about the three ways that we could write this opinion. And one thing I just want to start by clarifying, I think the Chief Justice pressed you a little bit on this. Is it correct to say, then, that the government has changed its position from the search stage to the merit stage about whether the statute is clear or ambiguous? No, Your Honor. The agency's position has been that the statute is unambiguous at Chevron Step One, but in the alternative, if it's ambiguous, it would have reached the same reason. We're not backing away from that position, but we do think that the court doesn't need to reach that. And we think the court's precedents have indicated that the court won't foreclose the agency in a case like this from considering whether any other alternative is possible. Okay, well, then I guess I'm where Justice Alito was when he said he didn't really understand the difference between that position and you're asking us to give you Chevron deference. And I guess I also think if that's your position, how do we avoid addressing some of the issues that the petitioner raises about whether the interpretations that the government has offered here are even entitled to Chevron deference at all because they're informal adjudications, et cetera? Justice Barrett, I think you could resolve the case if you were at all. You could simply resolve the case along the lines that Justice Kavanaugh's second option suggested, that the government has the better reading of the statute. That would be sufficient to affirm the judgment below and the court could say no more. We would also be perfectly fine with the court saying that the government's interpretation is reasonable and petitioners haven't met their bar to show that our position is unambiguously foreclosed. Either of those conclusions would be fine with us because we think that they would affirm the legitimacy of the government's longstanding and consistent interpretation. But you don't want Justice Kavanaugh's, I think it was his third, saying that it is unambiguously in your favor. That's right, Your Honor. And just the reason for that is because we think that as a general matter, it is the agency that has been expressly charged by Congress with interpreting this statute. And we think that generally the court recognizes that because of that feature and because it implicates questions of foreign affairs, the court should not reach out to foreclose the agency from ever deciding a case. Okay, Mr. Hewson, just so I don't run out of time, let me just ask you one other question. Is it the case that you visa holders are the only non-immigrants who have not been admitted? Or are there others? I mean, putting aside Alien Crewman, are there others besides you visa holders? I think that they are the only ones, Your Honor. And if I might just elaborate on that point for one minute, it's true, as my friend suggests, that you non-immigrants have been treated for certain purposes as admitted into the United States. The question in Guarnicchia Silva was about whether the grant of U visa status was an admission for purposes of a certain time bar in the INA. But if that, you know, insofar as that's true, it's because Congress has created a special provision for them in Section 1255M, labeling some of them as admitted. And I think that just as admitted, even though they didn't come here lawfully, and the stark contrast between Congress' drafting choice in that provision and the TPS provision has to be given respect, I think. Thank you. A minute to wrap up, Mr. Houston. Thank you, Mr. Chief Justice. I'd like to just briefly recap the textual reasons why the agency's statutory construction is not unambiguously foreclosed. First is the definition of admitted, which petitioners concede they can't meet. Second is the direct textual parallelism between the two-part lawful status benefit in the TPS statute and the two-part lawful status requirement for adjustment of status, which suggests the TPS statute doesn't address the other requirements for adjustment of status like admission. Third is the fact that the lawful status benefit is available only, quote, during the TPS period, which I think is strong evidence that it does not retroactively cure pre-TPS conduct that made the person ineligible for adjustment of status. And finally are all the other places in the INA where Congress has expressly authorized various classes of aliens to adjust their status, notwithstanding their entry without admission. Petitioners haven't explained why Congress didn't follow any similar course for TPS recipients. And so the court need only hold in this case that for all of those reasons, the agency's interpretation of the statute was reasonable. Thank you. Thank you, counsel. Ms. Zaharia, rebuttal? Yes. One clarification. Government counsel referred to the tens of thousands of TPS recipients who have adjusted status. It is highly unlikely that those are, even the majority of those are people who entered as non-immigrants because the vast minority of TPS recipients entered this country as non-immigrants. Those are almost certainly people who adjusted status pursuant to the government's prior position that re-entry on parole permits an adjustment of status. Now with respect to the question of whether admission is inherent in non-immigrant status, when it comes to non-immigrants, those are not distinct concepts. A great example of that is section 1258 governing a change of status, which Congress expressly cross-referenced in F4, the provision at issue. That provision explains that the agency may change a non-immigrant classification, quote, in the case of any alien lawfully admitted to the United States as a non-immigrant who is continuing to maintain that status, end quote. Congress there expressly equated the concept of being admitted as a non-immigrant with having lawful status as a non-immigrant, and that is entirely consistent with how that concept is treated throughout the INA. Now I think I heard government counsel to concede that if you look in every tunnel and on every mountain in this country, every single non-immigrant except for alien crewmen and U visa holders are in fact admitted. Alien crewmen are the exception that proves the rule because non-immigrants who did not exist in 1990, the statute which is section 1255 M1A expressly refers to them as having been admitted. It permits adjustment if they have been physically present in the United States for continuous periods since the date of admission as a non-immigrant. I'm not sure I understood counsel's attempt to distinguish away the Garnica-Silva case, that case did not just deem U visa non-immigrants to be admitted for one single purpose, it held unequivocally that they are admitted based on this language that I just quoted, the language of the INA and the government's own regulations. The only category of non-immigrants who are not admitted are alien crewmen and they are the exception that proves the rule. Thank you. Thank you counsel, the case is submitted.